# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-1641V**
**Filed: June 8, 2026**

|  |  |
|---|---|
| WILLIAM PLUMMER, JR.,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Special Master Horner |

*Leigh Finfer, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Tyler King, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING ON ENTITLEMENT[1]

On November 23, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012).[2]  Petitioner alleged that he suffered either a Table Injury of "SIRVA," *i.e.*, a shoulder injury related to vaccine administration, or a shoulder injury caused-in-fact by his vaccination, following receipt of an influenza ("flu") vaccine on October 5, 2019.  (ECF Nos. 1, 39.)  For the reasons set forth below, I conclude that petitioner is entitled to compensation for a shoulder injury caused-in-fact by his vaccination.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

## I.       Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-11(c)(1)(C)(i); § 300aa-13(a)(1); § 300aa-14(a).

The Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by*, 42 C.F.R. § 100.3.  In this case, however, the Chief Special Master already issued findings of fact and conclusions of law that determined that petitioner cannot meet the specific requirements for demonstrating a Table SIRVA because he did not demonstrate an onset of shoulder pain within the requisite period.[3]  (ECF No. 24, p. 6; 2023 WL 8300436, at *4. (Fed. Cl. Spec. Mstr. Oct. 23, 2023).)

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53

---

[3] Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide a more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," petitioner must demonstrate the following: (i) there is "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection"; (ii) that "[p]ain occurs within the specified time-frame," *i.e.*, within 48 hours of vaccination; (iii) that the "[p]ain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered"; and (iv) that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  42 C.F.R. § 100.3(c)(10).

(Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact. *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a). That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence." *Moberly*, 592 F.3d at 1322 n.2 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. of S. Cal.*, 508 U.S. 602, 622 (1993)). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991). However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination. *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II.    Procedural History

The petition was accompanied by medical records marked as Exhibits 1-4 and an affidavit marked as Exhibit 5. (ECF No. 1.) The case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU") for potential informal resolution based on the allegations of the petition. (ECF Nos. 8-9.) Petitioner later filed an amended petition (ECF No. 12) and an amended affidavit (ECF No. 15; Ex. 6).

In July of 2021, the Chief Special Master issued an order directing petitioner to show cause why petitioner's Table SIRVA claim should not be dismissed in light of issues relating to onset and the date of vaccination at issue. (ECF No. 18.) In response to the order, petitioner filed a further witness declaration (ECF No. 20; Ex. 7), and the parties submitted briefs (ECF Nos. 21-22). Thereafter, on October 23, 2023,

the Chief Special Master issued findings of fact and conclusions of law dismissing petitioner's Table SIRVA claim.  (ECF No. 24; 2023 WL 8300436.)  Specifically, the Chief Special Master concluded that the evidence does not preponderate in favor of an onset of shoulder pain occurring within 48 hours of vaccination.  (ECF No. 24, p. 6.; 2023 WL 8300436, at *4.)

After the parties were unable to resolve the remaining cause-in-fact claim informally, the case was reassigned to the undersigned in May of 2024.  (ECF Nos. 33-34.)  Petitioner filed a second amended petition clarifying his cause-in-fact allegation (ECF No. 39), as well as an expert report by Naveed Natanzi, D.O. (ECF No. 40; Exs. 8-10), in September of 2024.  Respondent then filed his Rule 4 Report, recommending against compensation (ECF No. 43), as well as a responsive expert report by Geoffrey Abrams, M.D. (ECF No. 44; Exs. A-B), in December of that same year.  After petitioner filed a report by Dr. Natanzi responding to Dr. Abrams (ECF No. 46; Ex. 12), the parties agreed that the case was ripe for resolution by written briefs pursuant to Vaccine Rule 8(d) (ECF No. 47).

Petitioner filed his motion for a ruling on the written record on April 23, 2025 (ECF No. 48) and it is fully briefed (ECF No. 49 (response); ECF No. 50 (reply)).  I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

## III.    Summary of Record Evidence

### a.  Medical Records

Petitioner received the subject flu vaccination in his left arm on October 5, 2019. (Ex. 1, p. 1.)  On November 22, 2019, petitioner presented to his primary care provider with a complaint of left shoulder pain.  (Ex. 2, pp. 11-12.)  Petitioner reported having received a flu vaccination in October and "3 days later he [had] left shoulder pain [that] radiated down [from] left shoulder to left elbow.  (*Id*. at 11.)  An x-ray was normal, but physical exam showed reduced range of motion, strength deficits, and tenderness at the deltoid.  (*Id*. at 9, 12.)  Although petitioner was concerned he was experiencing a SIRVA ("he check[ed] internet for SIRVA"), his primary care provider first wanted to rule out neurologic conditions.  (*Id*. at 11.)  Accordingly, he was assessed as having "shoulder pain, left," and a neurology referral was recommended.  (*Id*.)

Petitioner was later seen by an orthopedist on February 6, 2020.  (Ex. 3, p. 12.) He complained of left shoulder pain and paresthesia.  (*Id*.)  Within the history of present illness, it is stressed that the symptoms "developed spontaneously" about four months prior, which is consistent with the history he provided his primary care provider, though petitioner's vaccination is not explicitly mentioned.  (*Id*.)  The physical exam

4

demonstrated positive signs of impingement, and petitioner was assessed as having left shoulder impingent and reduced range of motion, as well as paresthesia. (*Id*. at 13.) Left shoulder and cervical spine MRIs were recommended. (*Id*.)

Petitioner underwent the recommended MRI studies on February 29, 2020. (Ex. 3, pp. 14-18.) The radiologist's impression for the shoulder MRI included five findings as follows:

1. 5 mm focal full-thickness tear of the rotator cuff involving the anterior distal fibers of the supraspinatus tendon;
2. Tendonitis of the untorn portions of the supraspinatus tendon;
3. Diastasis of the left acromioclavicular joint associated with mild arthrosis of the left acromioclavicular joint;
4. Synovitis of the tendon sheath of the long head of biceps;
5. Glenohumeral joint effusion.

(*Id*. at 15.)

Petitioner returned to the orthopedist on March 6, 2020, to review the MRI results. (Ex. 3, p. 20.) The orthopedist noted the MRIs to show a herniated discs at C5/6 and C6/7 and a left rotator cuff tear. (*Id*.) Petitioner was directed to think about surgery and follow up if he decided to proceed. (*Id*. at 21.) In June of 2020, he confirmed he would like to proceed with a rotator cuff repair, which was performed on June 15, 2020. (*Id*. at 22, 40.)

The remainder of petitioner's medical history is not significant to the issues addressed herein.

b. Affidavits

In his affidavit, petitioner asserts that, prior to the vaccination at issue, he had no prior history of left shoulder injury. (Ex. 5, p. 1; *see also* Ex. 6, p. 1.) He also asserts that he experienced significant left shoulder pain "immediately" following his vaccination.[4] (*Id*.) Petitioner's wife, Ms. Llamas, also submitted a declaration. (Ex. 7.) She likewise recalled that petitioner experienced immediate pain following his vaccination and that both she and he felt it was unusual that his pain did not resolve within the two days following the vaccination. (*Id*. at 1.) She asserts that what petitioner told his physician was that he still had pain on the third day post-vaccination. (*Id*.) However, the basis for this assertion is not indicated. (There is no indication in the medical record that she was present during the encounter.)

---

[4] Only petitioner's initial affidavit, which misstates the date of vaccination, is notarized. (Ex. 5, p. 2.) The amended affidavit is the same as the initial affidavit, apart from correcting the date of vaccination. (Ex. 6.)

c.  Expert Opinions

On petitioner's behalf, Dr. Natanzi[5] explains that, whereas petitioner had no prior history of left shoulder pain, his post-vaccination treatment records are consistent in demonstrating pain, limited range of motion (citing Ex. 2, p. 11), and positive impingement signs (citing Ex. 3, p. 12), all of which are consistent with a shoulder injury. (Ex. 8, p. 3.)  Thus, "given the clinical context and timing of symptoms relative to the vaccine, they likely point to a shoulder injury related to vaccine administration (SIRVA). This strongly suggest[s] a causal relationship between the vaccination and symptoms." (*Id*.)

In Dr. Natanzi's estimation, onset of shoulder pain in this case likely occurred immediately post-injection, even if petitioner did not come to be concerned until around 2-4 days following vaccination.  (Ex. 8, pp. 3-4.)  However, Dr. Natanzi opines that an onset period of 3-4 days would still be compatible with the SIRVA concept.  (*Id.* at 4.)  Dr. Natanzi cites a review article by Cagle, which found that 16% of a population of 56 shoulder injury patients experienced symptoms onset greater than 48 hours following vaccination.  (*Id.* (citing Paul J. Cagle, Jr., *Shoulder Injury After Vaccination: A Systematic Review*, 56 Revista Brasileira de Ortopedia 299 (2021) (Ex. 11)).)

In response, Dr. Abrams[6] places onset of shoulder pain at 3 days post-vaccination.  (Ex. A, pp. 3-4.)  However, petitioner's later February 29, 2020 MRI

---

[5] Dr. Natanzi received his doctor of osteopathic medicine degree from Western University of Health Sciences in Pomona, California, in 2012, before going on to complete a traditional rotating internship at Downey Regional Medical Center in 2012, followed by a residency in physical medicine and rehabilitation at the University of California, Irvine, in 2016.  (Ex. 9, pp. 1-2.)  He then completed a fellowship as an attending physician of interventional regenerative sports and spine medicine at Bodor Clinic in Napa, California, in 2017.  (*Id.* at 1.)  From there, Dr. Natanzi briefly worked as an attending physician of interventional pain management at Pasadena Rehab Institute in 2017, before founding the Regenerative Sports and Spine Institute in Sherman Oaks, California, later that year.  (*Id.*)  Since 2018, Dr. Natanzi has maintained a position as a staff physician at VA Long Beach Healthcare System in Long Beach, California.  (*Id.*)  He is board certified in physical medicine and rehabilitation and pain management with fellowship training in interventional sports and spine medicine, and he maintains an active medical license in California.  (*Id.* at 4; Ex. 8, p. 1.)  In his clinical capacity, Dr. Natanzi "almost exclusively" treats musculoskeletal issues, and he estimates that he diagnoses and treats approximately 100 shoulder pathologies per month.  (Ex. 8, p. 1.)  In his research capacity, Dr. Natanzi has authored 7 publications, conducted a randomized controlled double blind study, and conducted research as a fellow at USC Norris Cancer Research Hospital.  (Ex. 9, pp. 3-4.)

[6] Dr. Abrams received his medical degree from the University of California, San Diego, in 2007, before going on to complete a surgical internship in the Department of General Surgery and a residency in the Department of Orthopedic Surgery at Stanford University Hospital and Clinics in 2008 and 2012, respectively, followed by a fellowship in Orthopedic Sports Medicine at Rush University Medical Center in Chicago, Illinois, in 2013.  (Ex. B, pp. 1-2.)  From there, Dr. Abrams briefly worked as a clinical instructor at Rush University Medical Center, before accepting a position as an attending physician at Veterans Administration Hospital in Palo Alto, California, as well as an assistant professor in the Medical Center Line at Stanford University School of Medicine, in 2013.  (*Id.* at 1.)  He was eventually elevated to associate professor in 2021.  (*Id.*)  Dr. Abrams is board certified in orthopedic surgery with a subspecialty in orthopedic sports medicine, and he maintains an active medical license in California.  (*Id.* at 2.)  He has

showed a small full thickness tear of the rotator cuff, as well as acromioclavicular joint and biceps tendon pathology.  (*Id*. at 4 (citing Ex. 3, p. 14).)  Dr. Abrams opines that "[i]t is unlikely that a vaccination would lead directly to any of these structural abnormalities, so it is reasonable to conclude that these findings were pre-existing to the October 5, 2019 influenza vaccination."  (*Id*.)  He further opines that, although he agrees petitioner had no prior history of left shoulder pain, "[i]t is less likely for these structural abnormalities to present with symptoms in an acute or sudden fashion, and is more likely that they present with a slowly progressing build up over many weeks to months."[7] (*Id*.)

In reply, Dr. Natanzi agrees that petitioner's MRI findings were not vaccine caused and likely preexisting; however, he charges that Dr. Abrams fails to take account of the relevant history.  (Ex. 12, p. 1.)  Although Dr. Natanzi agrees that, absent trauma, symptoms of shoulder degeneration would be likely to develop slowly or progressively, that is not petitioner's own history.  Instead, petitioner's injection, which likely involved needle overpenetration, is an "obvious trauma." (*Id*.)  Especially given that petitioner experienced an acute, rather than gradual, onset of pain, Dr. Abrams's opinion "is simply not supported by the clinical records" and provides no etiology for petitioner's pain. (*Id*.)

## IV.     Discussion

### a.  Table SIRVA

Generally, special masters may change or revisit any ruling until judgment enters, even if the case has been transferred.  *See McGowan v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 734, 737-38 (1994).  In most cases, however, a judicial officer, such as a special master, departs from previously decided issues only in the event of "new evidence, supervening law, or a clearly erroneous decision."  *Id.* at 737; *see also Sullivan v. Sec'y of Health & Human Servs.*, No. 10-398V, 2015 WL 1404957, at *20 n.36 (Fed. Cl. Spec. Mstr. Feb. 13, 2015).  Thus, petitioners should not expect that the Chief Special Master's findings in SPU cases will be revisited simply as a result of reassignment to another special master.  *E.g.*, *Kuczarski v. Sec'y of Health & Human Servs.*, No. 20-312V, 2023 WL 8713719, at *6 (Fed. Cl. Spec. Mstr. Nov. 17, 2023) (explaining that "as long as a case continues to be litigated there is always a possibility that further record development will necessitate revisiting a prior finding based on newly discovered evidence.  However, petitioners should not view reassignment of a case out of the SPU as a second bite at the apple regarding what has already been decided."); *Molina v. Sec'y of Health & Human Servs.*, No. 20-845V, 2024 WL 4223393, at *8-9

---

"a surgical practice focused on orthopedic conditions of the shoulder and [has] also published extensively on shoulder and other musculoskeletal pathology, with over 130 total peer-reviewed publications."  (Ex. A, p. 1.)

[7] Dr. Abrams also observed that petitioner's ultimate surgical treatment was "acceptable," but a "dated" method of treatment.  (Ex. A, p. 4.)  Moreover, he notes that petitioner had evidence of cervical nerve impingement, but concludes that "the neck was not deemed to be a significant contributor to petitioner's overall clinical complaints."  (*Id*.)

(Fed. Cl. Spec. Mstr. Aug. 15, 2024) (maintaining the Chief Special Master's findings as to petitioner's alleged Table Injury claim).  *Cf. Pitts v. Sec'y of Health & Human Servs.*, No. 18-1512V, 2023 WL 2770943, at *8-10 (Fed. Cl. Spec. Mstr. Apr. 4, 2023) (revisiting a fact finding from the SPU in significant part due to a change in law).

In this case, petitioner has not argued that the Chief Special Master's finding of fact dismissing the Table SIRVA claim should be revisited.  However, I note in the interest of completeness that I have considered whether the evidence filed subsequent to that finding of fact would warrant re-evaluation of petitioner's Table SIRVA claim.  I find that it does not, and I adopt the Chief Special Master's finding and analysis of petitioner's Table claim as my own.

b.  Causation-in-Fact

As explained above, in a cause-in-fact context petitioner must meet the three-part *Althen* test by demonstrating: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.  *Althen,* 418 F.3d at 1278.

Under *Althen* prong one, petitioner's theory must be "reputable," *Pafford*, 451 F.3d at 1355 (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)), though it need only be "legally probable, not medically or scientifically certain," *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory.  *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)).  However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory," which must be "sound and reliable."  *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly*, 592 F.3d at 1322; then quoting *Knudsen*, 35 F.3d at 548-49).

Respondent raises two interrelated points with respect to general causation. First, respondent argues as a threshold matter that petitioner has not presented a defined injury that could support an *Althen* analysis.  (ECF No. 49, pp. 5-6 (citing *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1349 (Fed. Cir. 2010) (explaining petitioner must demonstrate "more than just a symptom or manifestation of an unknown injury").)  Second, and relatedly, "SIRVA is not an injury that exists outside of the regulatory framework" and, therefore, petitioner's reliance on the concept of SIRVA as "generally accepted" is conclusory, vague, and inadequate to support petitioner's burden of proof under *Althen* prong one.  (*Id*. at 6, 10-11.)

However, based on my review of the record, petitioner has put forward enough evidence to support a theory of causation under *Althen* prong one, albeit just barely.  To respondent's point, Dr. Natanzi's report is somewhat confusing in that he repeatedly invokes the acronym "SIRVA" without engaging in any significant delineation of a theory of causation.  (Ex. 8, *passim*.)  However, Dr. Natanzi did explicitly posit "a causal relationship between the vaccination and symptoms" and further noted that "[i]t is important to acknowledge that SIRVA is not a true medical diagnosis, but rather a syndrome that constellates a few typical shoulder diagnoses."  (*Id*. at 3-4.)  He then cited the Cagle paper, which, in turn, explains that the most common mechanism of SIRVA is "overpenetration of the deltoid muscle leading to injury either from a mechanical injury and/or from an immune response to the vaccine and/or adjuvants." (Cagle, *supra*, at Ex. 11, p. 2.)  Moreover, Cagle notes that the shoulder structures involved in that review study have included the "rotator cuff, labrum, capsule, bursa, [and] deltoid muscle" and, significantly, that "this included diagnoses of bursitis, rotator cuff tears, adhesive capsulitis, chondral injury, nerve injury and infection."  (*Id.*)  In his supplemental report, Dr. Natanzi more explicitly cited needle overpenetration to opine, consistent with the Cagle paper, that vaccination can cause a previously asymptomatic rotator cuff tear to become acutely painful.  (Ex. 12.)  This suffices to present a theory of causation under *Althen* prong one.  Although respondent is correct that a petitioner must substantiate a theory relative to a specific injury, and not merely rely broadly on the SIRVA concept to support a cause-in-fact claim, it is also the case that SIRVA literature remains relevant and applicable in cause-in-fact shoulder injury cases.  *E.g.*, *Layne v. Sec'y of Health & Human Servs.*, No. 18-57V, 2022 WL 3225437, at *18 (Fed. Cl. Spec. Mstr. July 12, 2022); *Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023).  For his part, respondent's expert, Dr. Abrams, opined that vaccination would be an unlikely cause of the type of structural abnormalities at issue; however, he otherwise agreed that "[a] diagnosis of SIRVA requires pain and most typically limited range of motion following a vaccination."  (Ex. A, pp. 3-4.)  Thus, the basic premise underlying SIRVA is not disputed by the medical experts.[8]

With general causation established, petitioner must also present evidence that the vaccine in question "did" cause petitioner's injury.  This is assessed under the second and third *Althen* prongs.  The third prong asks whether the timing of injury in this specific case aligns with what would be expected based on the general theory presented under *Althen* prong one.  *Pafford*, 451 F.3d at 1358.  This encompasses two questions: (1) what was the actual timing of onset in the case; and (2) does that timing of onset support a causal inference pursuant to petitioner's theory?  The second *Althen* prong requires preponderant proof of a logical sequence of cause and effect, which is

---

[8] Given that both petitioner's counsel and Dr. Natanzi appear regularly in this Program, they are cautioned that Dr. Natanzi's reports in this case are far from ideal, given how spartan they are with respect to the theory of causation upon which his clinical assessment relies.  As noted above, petitioner just barely met his burden of proof in light of the record as a whole.  Even a slight difference in the record evidence could have left Dr. Natanzi's reports inadequate.

usually supported by facts derived from petitioner's medical records.[9]  *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cl. Spec. Mstr. Feb. 25, 1992). While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion.  *See* § 300aa-13(a).

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three can be probative with respect to *Althen* prong two.[10]  *Capizzano*, 440 F.3d at 1326-27. Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof.  *See, e.g.*, *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal  relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

Respondent argues that petitioner has not articulated a medically acceptable timeframe for onset of his condition as required under *Althen* prong three.  (ECF No. 49, pp. 10-11.)  He also argues relative to *Althen* prong two that no treating physician opinion supported vaccine causation.  (*Id.* at 11.)  And, finally, he argues that Dr.

---

[9] Medical records are generally viewed as trustworthy evidence.  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Id.*  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master.  § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

[10] The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine.  A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

440 F.3d at 1327.

Natanzi's opinion attempts to merely rely on temporal proximity and, moreover, that he contravenes the prior finding of fact by asserting that onset was immediate. (*Id*. at 11-12.) However, I am not persuaded by any of these arguments.

In this case, I find petitioner's initial treatment record to be the most probative with regard to onset. (Ex. 2, p. 11.) Accordingly, I conclude that the evidence preponderates in favor of a finding that the onset of petitioner's shoulder pain occurred three days post-vaccination, which I further find, pursuant to *Althen* prong three, supports a causal inference under the theory presented by petitioner. Although Dr. Natanzi opined that onset was earlier, he explicitly indicated that a three-day onset is consistent with his causal opinion, citing the Cagle paper as showing that 16% of patients observed had onset of shoulder symptoms more than 48 hours post-vaccination. (Ex. 8, p. 4 (citing Cagle, *supra*, at Ex. 11).) This is also consistent with prior Program experience. *E.g.*, *Martin v. Sec'y of Health & Human Servs.*, No. 21-2220V, 2025 WL 4020803, at *10-11 (Fed. Cl. Spec. Mstr. Dec. 5, 2025); *Jewell v. Sec'y of Health & Human Servs*., No. 16-0670V, 2017 WL 7259139, at *3 (Fed. Cl. Spec. Mstr. Aug. 4, 2017); *see also Murray v. Sec'y of Health & Human Servs*, No. 17-1357V, 2022 WL 17829797, at *16-17 (Fed. Cl. Spec. Mstr. Oct. 27, 2022). And, although Dr. Abrams noted onset to have been three days post-vaccination, he did not actually opine as to the significance of this fact. (Ex. A, pp. 3-4.) Instead, he opined that it was petitioner's MRI findings that were the "confounding factor." (*Id*. at 4.)

I also find Dr. Natanzi more persuasive than Dr. Abrams with respect to the question of whether petitioner's own history supports a logical sequence of cause and effect implicating his vaccination as a cause of his condition under *Althen* prong two. Dr. Abrams suggested that petitioner's vaccination should be exonerated because structural abnormalities, such as those present on petitioner's MRI, are "less likely . . . to present with symptoms in an acute or sudden fashion." (Ex. A, p. 4.) Instead, he opined that "they present with a slowly progressing build up over many weeks to months." (*Id.*) However, he otherwise agreed that petitioner did not have any prior history of shoulder pain and that the onset of his shoulder pain can be pin-pointed to the third day after his vaccination. (*Id*. at 3-4.) To that point, petitioner's orthopedic treatment records repeatedly remark that his pain occurred "spontaneously." (Ex. 3, p. 12.) Thus, Dr. Abrams's report does not readily support the notion that petitioner's structural abnormalities alone explain his clinical history, a point that Dr. Natanzi stressed in his supplemental report. (Ex. 12.) By contrast, Dr. Natanzi is persuasive in opining that the overall clinical history, including the acute post-vaccination change in petitioner's condition, more readily supports the idea that a trauma is responsible for causing petitioner's previously asymptomatic rotator cuff tear to become symptomatic. (Ex. 8, pp. 3-4; Ex. 12, pp. 1-2.) And, while respondent is accurate in noting that no treating physician opined in favor of vaccine causation, this factor is tempered by the fact that the medical records do not indicate that petitioner even told his orthopedist about his vaccination. (Ex. 3, pp. 12-13.)

## V.    Conclusion

After weighing the evidence, and considering the record as a whole, I find that petitioner has preponderantly demonstrated that he is entitled to compensation for a shoulder injury caused-in-fact by his October 5, 2019 flu vaccination.  A separate damages order will be issued.

**IT IS SO ORDERED.**

<u>**s/Daniel T. Horner**</u>
Daniel T. Horner
Special Master

12